# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

DAVID SPARKS and DEBORAH
BUCHHORN,

      Plaintiffs,

    vs.                                                                 No. CIV 98-1336 LH/RLP

NATIONAL ELEVATOR INDUSTRY
HEALTH BENEFIT PLAN, and the BOARD
OF TRUSTEES OF THE NATIONAL
ELEVATOR INDUSTRY HEALTH
BENEFIT PLAN,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Application for Temporary

Restraining Order and/or Preliminary Injunction (Docket No. 4), filed November 16, 1998. The

Court, having considered the pleadings submitted by the parties, the arguments of counsel at the

hearing held in this matter on December 14, 1998, and otherwise being fully advised, finds that the

Application for a Temporary Restraining Order is **moot** and will be **denied** as such, and that the

Application for a Preliminary Injunction is well taken and will be **granted**.

### INTRODUCTION

The Plaintiffs seek a temporary restraining order or preliminary injunction barring the

Defendants from ending their nearly eleven year practice of providing funding under the National

Elevator Industry Health Benefit Plan ("the Plan") for 24 hour in-home skilled nursing care for Plaintiff Sparks. Sparks "suffers from advanced muscular dystrophy, which has caused complete paralysis and respiratory failure" making him dependent upon a ventilator and 24 hour nursing care. (Pls.' Mem. Supp. App. TRO Prelim. Injuc. at 1.) The Defendants assert that, as a result of a series of changes in the Plan, the Plaintiff is no longer entitled to receive funding for 24 hour nursing care. As the Defendants have had a full and fair opportunity to respond to the application in writing and at the hearing held in this matter on December 14, 1998, the Court concludes that the request for a Temporary Restraining Order is moot, and it will only consider the motion for a preliminary injunction.

To succeed on a motion for preliminary injunction, the Plaintiffs must establish that (1) they will suffer irreparable injury unless the injunction issues; (2) that the injury to the movant outweighs any damage the proposed injunction would cause the Defendants; (3) that the injunction would not be adverse to the public interest; and (4) that there is a substantial likelihood that the Plaintiffs will succeed on the merits. *Walmer v. United States Department of Defense*, 52 F.3d 851, 854 (10th Cir. 1995) (citing *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980)). For purposes of the instant motion, the Defendants only challenge the Plaintiffs' assertion that they have a substantial likelihood of success on the merits. (Defs.' Mem. Opp. Pls.' Mot. Prelim. Injuc. at 2.) The Court concludes that this concession is justified given the facts presented by the parties. (*See generally* Pls.' Mem. Supp.) As a result of the Defendants' concession that the first three factors weigh in the Plaintiffs' favor, the Plaintiff "may establish likelihood of success by showing questions going to the merits so serious, substantial, difficult, and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." *Walmer*, 52 F.3d at 854.

## THE INTERPRETATION DISPUTE

The dispute between the parties arises from their differing interpretations of the relationship between two sections of the Plan. In the 1998 version of the Plan, the Home Health Care section clearly limits home health care services—including part-time or intermittent nursing care—to 80 four-hour visits per calendar year. (*See* Scarilot Dec. Ex. 6 at 56.) However, in a separate and rather confusing section, the Plan states that "Benefits are payable for the services of a Registered Graduate Nurse (R.N.), Licenced Practical Nurse (L.P.N.), and a licensed or certified . . . Nurse-Practitioner . . . when medically necessary and prescribed by a duly qualified Physician." (*See Id*. at 58.) Adding to the confusion, the Plan excludes from coverage "Nursing services preformed when a Covered Individual is confined in a Hospital" leaving the impression that these services are separate and apart from the benefits provided under the Home Health Care section. (*Id*.)

It is this interpretation that the Plaintiffs insist is correct. Their view is further supported by the Defendants' previous interpretation of these separate clauses under earlier versions of the Plan. The availability of 24 hour in-home nursing services as a separate and distinct benefit, when the Plaintiff first inquired about this coverage in 1987, is undisputed. (*See* Scarilot Dec. Ex. 2 at 40.) In that version of the Plan, and several subsequent versions, long term nursing care was available under a Major Medical Expense Benefits provision, while home health care benefits were contained in a separate description of covered medical benefits. The prior administrator of the Plan, Travelers Insurance, informed Plaintiff Sparks' stepfather that under the Plan then in effect, the home health care limitation did not apply to the nursing services provided under that Plan's major medical provision. (Aff. Deborah Buchhorn ¶ 14.) However, the previous distinction between covered benefits and "major medical" benefits was dropped in 1995, in favor of a Comprehensive Medical

Benefits section which contained the current language relating to both home health care and nursing services.  (*See* Dec. John A. McGowan, Ex. 1 at 41, 46-47, 49.)  The instant dispute arises out of this merger of the general benefit and major medical sections of the Plan.

The 1998 version of the Plan did little to resolve the confusion created by the elimination of the major medical coverage as a separate section.  (*See* Scarilot Dec. Ex. 5 at 56, 58.)  In the 1998 version, benefits are described under a Comprehensive Medical Benefits section, as they were in the 1995 version.  Although the nursing services language is not specifically identified as a benefit, it is placed in a lengthy list of items which are clearly covered medical expenses under the Plan.  (*See Id.* at 50-65.)  Moreover, there is no obvious relationship between the Nursing Services language and the Home Health Care Expenses section.  It is true that the description of Nursing Services follows the description of Home Health Care Expenses, however, sections describing the obvious benefits covering hospice care, hospital charges, and medical and surgical supply expenses are placed between the two sections in dispute.  (*Id*. at 56-58.)

The Court should give great deference to the Defendants' interpretation as the Plan grants substantial discretion to the Trustees to resolve disputes and interpret the Plan.  *See Charter Canyon Treatment Ctr. v. Pool Co*., 153 F.3d 1132, 1135 (10th Cir. 1998) (holding challenges to denial of employee benefits should be reviewed under "an 'arbitrary and capricious' standard to a plan administrator's actions if the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms"); (Scarilot Dec. Ex. 5 at 122 (stating that the "Trustees [have] complete discretion and authority to determine the level of Benefits and to determine eligibility for Benefits").  However, given the confusing language in the 1998 version of the Plan and the past practice of the Trustees and the prior administrator, the Defendants' interpretation of the

1998 Plan is simply not reasonable. *See Semtner v. Group Health Servs. of Okla., Inc.*, 129 F.3d 1390, 1393 (10th Cir. 1997) (holding that the "touchstone of [the arbitrary and capricious standard in the denial of benefits context] is whether the defendant's interpretation of its plan is reasonable"). Thus, based solely on the Plan's prior conclusion that Mr. Sparks was covered under previous versions of the Plan and the confusing descriptions of nursing services and home health care benefits, the Court would have to conclude that the Plaintiffs would have a "substantial likelihood of success on the merits" and were entitled to a preliminary injunction.

## The August Amendment

However, after a rather slow and arduous process of reviewing the appeal the Plaintiffs filed in response to the Plan's February 1998 letter indicating that the Plan would no longer cover 24 hour nursing services (Pls.' Ex 10), the Trustees amended the Plan once again in August of 1998. This amendment moves the nursing services language out of the section describing benefits and into the definitions section of the Plan. (Scarilot Dec. Ex. 7, ¶ 4 of the Revised Resolution.) Moreover, the amendment defines the type of care Mr. Sparks has been receiving—that is, long-term medical care designed to maintain the life of a patient suffering from a permanent condition—as "custodial care." (*Id*.) The amendment then limits the custodial care to the same home health care maximum of 80 four-hour visits per calender year and otherwise excludes such care from the Plan when the covered individual is not under the continuing care of a duly qualified Physician. (*Id*.)

Through their amendment, the Trustees have effectively imposed their somewhat tortured interpretation of the 1998 version of the Plan. (*See* Scarilot Dec. Ex. 7 at 3-4.) Unfortunately for the Plaintiffs, the Trustees are well within their authority to make this amendment, just as they were entitled to amend the Plan in 1995, eliminating the major medical provision. "Employers or other

plan sponsors are generally free under ERISA, *for any reason, at any time*, to adopt, modify, or terminate welfare plans." *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995) (emphasis added). The benefits under welfare plans such as the Plan in this dispute—on their own—simply do not vest or create any substantive entitlement. *Id*. Essentially, the Trustees can change the terms of the Plan, and the offered benefits on a whim unless they have agreed by the written terms of the Plan to vest the benefits. *See Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1510 (10th Cir. 1996) (holding "an employer or plan sponsor may unilaterally modify or terminate welfare benefits unless it contractually agrees to grant vested benefits"); *Gable v. Sweetheart Cup Co., Inc.*, 35 F.3d 851, 855 (4th Cir. 1994) (observing that "[i]t is well-established that ERISA does not prohibit a company from terminating or modifying previously offered benefits that are not vested" and that benefits can only be created by written plan documents); *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir. 1986) (noting that "ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued"). There is no suggestion in the evidence, or by the Plaintiffs, that a written promise to vest the benefits in dispute exists here.

### THE PLAINTIFFS' CLAIMS FOR CONTINUING BENEFITS

The Plaintiffs' argument about the proper standard to review the Trustee's interpretation of the Plan and their other arguments relating to the interpretation of the 1998 Plan are moot, in light of the August 1998 amendment. (*See* Pls.' Mem. Supp. at 10-14). The Plaintiff argues, however, that the August amendment of the Plan was invalid because there was no "economic necessity" for the amendment, because the Plaintiff was not provided with adequate notice of the impending amendment, and because the Defendants breached their fiduciary duties in amending the Plan. As the Court noted at the December 14, 1998, hearing, there is no support for these contentions. Plaintiff

asserts that the Trustees failed to act in accordance with the Plan's Declaration of Trust as they amended the Plan without an "actuarial determination of necessity." (Pls.' Mem. Supp. at 14.) However, the Declaration of Trust only requires the advice of an actuary if the Trustees intend to increase, not decrease the benefits provided under the Plan. (*See* Pls.'s Mem. Supp. Ex. 19 at 34.) Plaintiffs offer no support for their claim that the amendment is *invalid* because they were not provided with sufficient notice of the Trustees' intent to amend the Plan. (*See* Pls.' Mem. Supp. at 14-15.) Moreover, the Trustees clearly complied with ERISA's requirement that they notify affected parties of an amendment limiting benefits within sixty days of its adoption. *See* 29 U.S.C. § 1024.

Similarly, the Plaintiffs' argument that the Defendants somehow breached a fiduciary duty *in amending the Plan*, is without merit. Plaintiffs simply attempt to boot-strap their claim that the Defendants' unreasonable interpretation of the 1998 Plan resulted in an unfair denial of benefits onto their claim that the amendment was ineffective. (*See* Pls.' Reply Supp. at 8.) These actions are separate and distinct, and as the Court has already noted, the Defendants were well within their authority to amend the Plan in August. Moreover, as the Defendants note, amending welfare plans is not a fiduciary function and does not implicate the Trustee's fiduciary duties. (*See* Defs.' Mem. Opp. at 9 (citing *e.g. Walling v. Brady*, 125 F.3d 114 (3rd Cir. 1997) (holding in pension plan context that employers amending plan do not act as fiduciaries); *Milwaukee Area Joint Apprenticeship Training Comm. v. Howell*, 67, F.3d 1333, 1338 (7th Cir. 1995) (observing that the Seventh "Circuit has consistently held that the fiduciary duties owed to participants and beneficiaries under ERISA apply only to the administration of a plan, not to its formation, amendment, or modification")).)

Finally, the Plaintiffs argue that even if the amendment was effective, the Defendants should be equitably estopped from terminating the nursing services of Plaintiff Sparks. However, this

argument fails as well. The Tenth Circuit has refused to "import notions of promissory estoppel into ERISA" and has concluded that "no liability exists under ERISA for purported oral modifications of the terms of an employee benefit plan." *Miller v. Coastal Corp.*, 978 F.2d 622, 624 (10th Cir. 1992) (citing *Straub v. Western Union Telegraph Co.*, 851 F.2d 1262, 1265 (10th Cir. 1988)) (internal quotations omitted); *but see Cannon v. Group Health Service of Okla.*, 77 F.3d 1270 (10th Cir. 1996) (stating that the Tenth Circuit "has neither adopted nor rejected an equitable estoppel rule in the ERISA context"). Thus, the representations of the Trustees' predecessor, and the Trustees previous recognition of the Plaintiffs' claimed benefits are unlikely to have modified the written terms of the Plan. The Court must, therefore, reject the Plaintiffs' claim that they have a substantial likelihood of succeeding on the merits of their claim that the Defendants should be equitably estopped from ending Mr. Sparks' coverage.

### EQUITABLE CLAIM FOR TIME TO FIND MEDICALLY ACCEPTABLE ALTERNATIVES

Despite the Court's conclusions that the majority of the Plaintiffs' claims are without merit, it is compelled to recognize that the Plaintiffs have repeatedly and reasonably relied upon the representations of the previous Administrator and the Trustees that they were entitled to 24 hour nursing care under the Plan. These representations began with an employee of Travelers in 1987, apparently continued through January 1998, and were reinforced by the uninterrupted regular payment for "skilled nursing" services over nearly eleven years. (*See* Aff. Deborah Buchhorn ¶¶ 13-15, 19, and Ex. 9; Supp. Aff. Deborah Buchhorn ¶ 3.) Moreover, it is undisputed that the Plaintiff detrimentally relied upon the representations of employees of Travelers that he was entitled to 24 hour in-home nursing care under the Plan by submitting to a tracheostomy in 1987, so that he could

leave the hospital and return home. (*See* Defs. Mem. Opp. at 3-4; Aff. Deborah Buchhorn ¶¶ 12-13.) This decision is presumably irreversible.

The effect of ending in-home nursing care for Mr. Sparks is also not disputed by the Defendants. Plaintiffs' counsel put it most bluntly at the December 14, 1998, hearing—without 24 hour in-home nursing care, Mr. Sparks will probably die, and he will probably die soon. This dire prediction is borne out by the record. (*See generally* Aff. Deborah Buchhorn; Aff. Donald K. Porter, M.D.) Because Mr. Sparks is completely paralyzed and ventilator dependent, he is totally dependant on others for his rather complicated daily care.

> [He] requires daily physical assessment to look for evidence of evolving pneumonias from aspiration, skin break down that could result in decubitus ulcers and frequent checks of his ventilator to ensure proper functioning, maintenance and servicing and repair work as required. Endotracheal suctioning is required frequently and at least every hour. Bronchodilator medications need to be administered every four hours followed by percussion and postural drainage to ensure adequate clearance of retained pulmonary secretions. His tracheotomy needs to be cleaned a couple of times a day and the tracheostomy changed monthly.
>
> In addition to the administration of medications, monitoring of the patients medical status and management of his respiratory failure, the patient needs ongoing daily help with routine matters of life including lifting, turning, bathing, frequent repositioning to prevent skin break down, feeding, bowel and bladder care, range of motion exercises and other aspects of personal hygiene such as brushing teeth, getting hair cuts and dressing.

(Aff. Donald K. Porter, M.D. ¶ 4, Ex. 4.) While it is true that Mr. Sparks could receive such care in a hospital, or other institutional setting, such facilities pose serious dangers to his life now that he has a tracheotomy. (*See* Aff. Arti Prasad, M.D. ¶¶ 6, 8.) His own physicians predict that placement in a hospital setting would likely result in his death as he would be placed at a significantly higher risk of infection or other complication than he faces in his own home. (*Id*. ¶ 8.) The Defendants have not challenged this assessment.

It is also undisputed that alternatives to hospitalization do exist, however, they are not immediately available. (*See* Aff. Deborah Buchhorn Exs. 14-16.) For example, Mr. Sparks is on a waiting list for a Medicaid program for medically fragile persons, however, there are approximately sixty individuals ahead of Mr. Sparks and it generally takes six to nine months for openings to become available. (*Id.* ¶ 24; Ex. 14 at 1.) This program is apparently Mr. Sparks best known alternative to hospitalization. Mr. Sparks may also be eligible for the disabled and elderly Medicaid waiver program, however, this program has a waiting list of two to five years and will not currently provide all of the assistance Mr. Sparks needs. (*Id.* ¶ 26.)

The Court concludes that the Plaintiffs have shown a substantial likelihood of success on the merits of their claim in Count IV that the Defendants breached their fiduciary duty to Mr. Sparks in administering the Plan by failing to give him adequate time to find a medically acceptable alternative to his current care arrangements. It is also possible, that with an adequate opportunity for "deliberate investigation" Mr. Sparks may be able to show the Court that he is entitled to a narrow exception to the Tenth Circuit's refusal to apply the principals of equitable estoppel to ERISA. The Circuit certainly did not consider the impact of the narrow set of circumstances presented here when it concluded that estoppel was not applicable to ERISA claims. *See Miller*, 978 F.2d at 624-25 (rejecting applicability of equitable estoppel to ERISA claims in context of a claim for additional pension benefits); *compare Cannon*, 77 F.3d at 1270 (stating that the Tenth Circuit has "neither adopted nor rejected an equitable estoppel rule in the ERISA context" and discussing Eleventh Circuit's application of estoppel to written interpretation of an ERISA plan); *Kane v. Aetna Life Insurance*, 893 F.2d 1283, 1286 (10th Cir. 1990) (applying equitable estoppel to oral interpretation of ambiguous plan and finding that general prohibition of oral modification to ERISA plan

inapplicable to facts presented). Relying on the representations of Travelers in 1987 that he was entitled to coverage for 24 hour nursing care Mr. Sparks apparently agreed to an irreversible procedure so that he could return home. (Aff. Deborah Buchhorn ¶¶ 12-13.) The effect of withdrawing such care is near certain death. Assuming that he can ultimately prove such reliance, the irreversability of the procedure, and the apparent effect of withdrawing 24 hour in-home nursing care, he may be able to show the Court that he is entitled to have the Defendants estopped from withdrawing his coverage until such time as he obtains a medically acceptable alternative.

Be that as it may, the Plaintiffs have "show[n] questions going to the merits [of his claim in Count IV are] so serious, substantial, difficult, and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." *Walmer*, 52 F.3d at 854. Specifically, the Court finds that the Plaintiffs have shown that they detrimentally relied on the representations that 24 hour in-home nursing care was covered under the Plan, that the Plan has provided such care for nearly eleven years, that Mr. Sparks' very life is threatened by a change in his care, and that there are reasonable alternatives to immediate hospitalization should the Plaintiffs be given more time to pursue those alternatives. The Court also finds that the act of implementing the change—as opposed to amending the Plan—implicates the fiduciary duties of the Trustees as this is an administrative, rather than an "amending" function. The Plaintiffs' allegations that the Defendants had decided to terminate Mr. Sparks coverage as early as 1997, but withheld this information until August of 1998, is of particular concern, in light of the fiduciary duties implicated by the act of ending the payment for the services he currently receives and the equitable questions raised by the Plaintiffs. (*See* Pls. Mem. Supp. at 15-16; Compl. ¶¶ 57, 58.) Moreover, while the Trustees did vote to hold the effect of its amendment in abeyance for four months, it is clear that given Mr. Sparks' condition and the extremely

limited availability of medically acceptable alternatives to his current care, this period is insufficient and results in relatively insignificant notice.

When faced with a claim for equitable relief in the context of a severance plan, the Seventh Circuit noted that the "fact that a benefit plan might be terminated at the employer's whim, . . . does not inevitably imply that employees are not armed if they are not informed that the benefit program has been eliminated or downgraded." *Panaras v. Liquid Carbonic Industries Corp.*, 74 F.3d 786, 793 (7th Cir. 1996). As the *Panaras* court observed, covered beneficiaries "might undergo medical treatment assuming that it would be covered by a benefit plan" and that the "prejudice suffered in such a case—inability to plan properly for medical contingencies . . . can have actionable prejudicial effects . . . ." *Id.* at 793-94. While the circumstances faced by the *Panaras* court are substantially different from the instant matter, the prejudice faced here—the danger of imminent death—is irreversible. Therefore, the Court must conclude that the Plaintiff has established a substantial likelihood of success on their claim for equitable relief in Count IV of their Complaint "by showing questions going to the merits so serious, substantial, difficult, and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." *Walmer*, 52 F.3d at 854.

## CONCLUSION

Although this narrow claim for relief is far from established, given the serious threat to Mr. Sparks' life, the Court is compelled to issue a preliminary injunction prohibiting the Defendants from ending payment for the 24 hour nursing care that they currently provide. This will give the parties the opportunity to complete discovery and present their arguments to the Court on the claim in Count IV that Mr. Sparks is entitled to adequate time to prepare for a medically acceptable alternative to his current care, as well as the claim in Count V for equitable estoppel. The Court can then consider

-12-

the serious, substantial, and difficult questions of whether the Plaintiffs are entitled to some form of equitable estoppel or if he is entitled to an equitable remedy providing a period of notice sufficient for Mr. Sparks to find alternative care that does not pose a serious threat to his life. Mr. Sparks should, of course, be pursuing those alternatives now. For these reasons, the Court will preliminarily enjoin the Defendants, pursuant to Federal Rule of Civil Procedure 65, from stopping payment for any services the Plaintiffs currently receive for Mr. Sparks' care under the Plan. This injunction will remain in effect until this issue is fully litigated before the Court.

IT IS, THEREFORE, ORDERED that the Plaintiffs' Application for Temporary Restraining Order (Docket No. 4-1), filed November 16, 1998, is **denied as moot**.

IT IS FURTHER ORDERED that the Plaintiffs' Application for a Preliminary Injunction (Docket No. 4-2), filed November 16, 1998, is **granted**.

IT IS FURTHER ORDERED that the Defendants are **preliminarily enjoined** from terminating payment for the nursing services Plaintiff Sparks currently receives under the National Elevator Industry Health Benefit Plan and are **ordered** to continue those payments until this injunctive relief is lifted by the Court.

_____
**UNITED STATES DISTRICT JUDGE**